UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GIPSON MECHANICAL CONTRACTORS, INC. | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 3:18-cv-00768 ) Judge Aleta A. Trauger ) |
| U.A. LOCAL 572 OF THE UNITED ASSOCIATION OF THE JOURNEYMAN AND APPRENTICES OF THE PLUMBING AND PIPEFITTERS INDUSTRY OF THE UNITED STATES AND CANADA (AFL-CIO), and **PLUMBERS & PIPEFITTERS LOCAL 572 BUILDING CORPORATION**, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM

Pending before the court is a Motion to Dismiss (Docket No. 12) filed by the defendants, U.A. Local 572 of the United Association of the Journeyman and Apprentices of the Plumbing and Pipefitters Industry of the United States and Canada (AFL-CIO) ("U.A. Local 572") and Plumbers & Pipefitters Local 572 Building Corporation ("Local 572 Building Corp."), in response to an Amended Complaint filed by the plaintiff, Gipson Mechanical Contractors, Inc. ("Gipson") (Docket No. 6.) Gipson has filed a Response in opposition (Docket No. 16), and the defendants have filed a Reply (Docket No. 17). For the reasons discussed herein, the defendants' motion will be granted in part and denied in part.

## BACKGROUND[1]

---

[1] The facts are taken from Gipson's Amended Complaint and are viewed in the light most favorable to the plaintiffs.

1

Gipson is a construction services corporation specializing in industrial mechanical work, pipefitting, mechanical service, and related work. U.A. Local 572 is a labor union with its principal place of business located at 225 Ben Allen Road, Suite 102, Nashville, TN 37207-3031. Local 572 Building Corp. is a public benefit corporation formed to acquire and maintain property for labor organizations. Its principal place of business is also located at 225 Ben Allen Road, Suite 102, Nashville, TN 37207-3031. Local 572 Building Corp. has owned the property located at 225 Ben Allen Road for nearly forty years. Both U.A. Local 572 and Local 572 Building Corp. conduct their business operations out of the same facilities there. U.A. Local 572 lists the property as its asset in Form LM-2 Labor Organization Annual Reports that U.A. Local 572 files with the U.S. Department of Labor. U.A. Local 572 has pledged the property located at 225 Ben Allen Road as collateral for one or more loans obtained by U.A. Local 572. In 2015, U.A. Local 572 was represented by attorney James Stranch, III, who was also Local 572 Building Corp.'s registered agent for service of process. (Docket No. 6 at 10–11.)

In 2008, Gipson opened a new operations branch in Nashville, TN, in order to provide heavy industrial mechanical work on construction projects and service for existing mechanical systems in commercial buildings and structures in the Middle Tennessee area. Gipson contacted U.A. Local 572 to arrange for union employees to work on both its construction and commercial services business operations. Gipson and U.A. Local 572 agreed to be bound by a previously-negotiated agreement between U.A Local 572 and the master plumbing, heating, piping, and air conditioning contractors of Middle Tennessee. That agreement was entitled "Working Agreement Between Plumbers and Pipefitters U.A. Local 572 and the Master Plumbing Heating, Piping and Air Conditioning Contractors of Nashville and Vicinity" ("2007 Master Agreement"). The parties subsequently agreed to successor versions of the 2007 Master Agreement—the "2010 Master

Agreement" and "2013 Master Agreement," collectively the "Master Agreements"—that were, for the purposes of this motion, substantially similar in terms.[2] All three agreements contained the following Grievance Procedure:

## ARTICLE XII
## GRIEVANCE PROCEDURES

**Section 1.** In recognition of the jurisdiction claims as set out in this Agreement, it is understood that the assignment of work, and the settlement of jurisdictional disputes with other Building Trade Organizations shall be adjusted in accordance with the procedure established by the National Joint Board for the settlement of jurisdictional disputes, or any successor Agency of the Building and Construction Trades Department.

There shall be no stoppage of work because of jurisdictional disputes.

**Section 2.** All differences as to interpretation and meaning of the Agreement between the parties shall be settled in accordance with the following procedures:

    (A)    The Contractor and the Union, through their authorized representatives, shall attempt to settle the matter in dispute.

    (B)    In the event that the dispute is not so settled, it shall be referred to the Joint Arbitration Committee consisting of three (3) representatives designated by the "Historical Bargaining Group"

---

[2] Several documents in the record are referenced in the Amended Complaint, relied upon in the parties' briefs, and cited in this Memorandum. Generally speaking, if, in support of a motion under Rule 12(b)(6) or 12(c), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The obligation to treat a motion to dismiss as a summary judgment motion is typically mandatory if matters outside the pleadings are not excluded by the court. *See Max Arnold & Sons, LLC v. W.L. Hailey & Co., Inc*., 452 F.3d 494, 503 (6th Cir. 2006) (applying Rule 12(d) to a Rule 12(c) motion). However, a court may consider matters outside the pleadings without converting the motion to a Rule 56 motion if the documents are "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." 5B Wright & Miller, Federal Practice and Procedure § 1357 (3d ed.), cited in *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). The court will therefore consider the 2013 Master Agreement and Memorandum of Understanding, which are attached to the Complaint. (Docket No. 6-1.) One document cited by the plaintiffs, however, does not meet these criteria: an affidavit given by Gipson's president, Winston Gipson, attached to Gipson's Response. (Docket No. 16-1.) The court will not consider the affidavit, as it is outside the parameters of what may be considered on a motion to dismiss.

and three (3) representatives designated by the "Union." Said Committee shall meet within twenty-four (24) hours following receipt of a notice in writing from either of the parties hereto.

The Joint Committee reserves the right to make the final decision in any dispute, and final interpretation of any of the Articles of this Agreement subject to the rules of Arbitration set forth herein. If said Committee is unable to reach a decision within three (3) days following its first meeting, said Committee shall submit the dispute to the Industrial Relations Council for the Plumbing and Pipe Fitting Industry. Pending final decision of the Industrial Relations Council, in accordance with its published procedures and rules, all terms and conditions for this Agreement shall continue in full force and effect, meanwhile, there shall be no work stoppage. The determination reached in this Grievance Procedure shall be final and binding upon all parties involved.

(Docket 6-1 at 19.)

The Master Agreements were supplemented with a Memorandum of Understanding, which included the following provision:

To compete for commercial work against non-union contractors, the union recognizes that the contractors' average cost per hour (including labor burden) must be competitive. A "Target Rate" will be established based upon the average hourly cost of non-union labor. The union and the contractor mutually agree to use increased ratios, promotional funds and any other legal means available to provide skilled labor at an average rate equal to the target rate when competing against non-union contractors for commercial work. Helpers and pre-apprentices will not be used when first year apprentices are available.

As economic conditions change, the Target Rate shall be re-calculated and adjusted as recommended by the Work Recovery Committee.[3] The hourly rates used to forecast the contractor's average labor cost per hour and the Target Rate shall be calculated using spreadsheets which are maintained by the Work Recovery Committee.

(*Id*. at 22.) This provision served to level the playing field for union employers. Mechanical contractors who utilize non-union employees typically pay lower wages to their employees than

---

[3] The Master Agreements state that, "[i]n order to recapture work which has been lost to contractors not signatory to this Agreement, the Local Union and the *Employees* hereby agree that each side will elect four representatives to serve on the Work Recovery Committee (WRC)." (Docket No. 6-1 at 20 (emphasis added).) Given the context, the court assumes that the committee is comprised of four union representatives and four *employer* representatives.

4

contractors who utilize union employees. Thus, to allow employers who were signatories to the Working Agreements to be able to compete with mechanical contractors who retained non-union employees, the Working Agreements require signatory employers to deduct a specified amount from the wages of the union employees for union-related contributions, including a Market Recovery Fund that was maintained by U.A. Local 572. U.A. Local 572 would then issue grants to the signatory employers in the form of a wage supplement, which would in turn allow signatory employers to reduce the amounts of their bids for work in order to make signatory employers more competitive with contractors who relied upon non-union labor to perform work.

The Market Recovery Fund is mentioned only once in the Master Agreements or Memorandum of Understanding.[4] Neither the Master Agreements nor Memorandum of Understanding outline the process by which Market Recovery Funds are allocated or the parameters of such allocations. The Master Agreements designated Billy Borchert as U.A. Local 572's Business Manager. From 2009 through 2015, Borchert authorized Market Recovery Fund grants to Gipson and other signatory employers. The process operated as follows: upon authorization, Gipson provided an estimate of the number of man-hours needed to complete a qualifying project. Borchert would then provide Gipson a maximum grant amount that could be committed for the project and a corresponding amount-per-man-hour-worked that would be paid upon submission of time sheets validating the hours worked by U.A. Local 572 members. In reliance on those commitments, Gipson would then adjust its bid estimates by reducing labor costs.

---

[4] This mention comes in Article XIII of the Master Agreements: "In order to maximize the effectiveness of the Market Recovery Fund, commercial work shall be performed with the minimum number of journeymen required to properly complete the work; however, the percentage of journeymen employed shall not be less than 20% of the total number of men (including all classifications of this contract). If target funds are available to reduce more than 20% of the total hours to a competitive rate, then a larger percentage of journeymen (up to 100%) will be utilized." (Docket No. 6-1 at 20.)

5

When bids were successful, Gipson would enter contracts to perform work at the reduced labor costs made possible by the Market Recovery Fund grants. Once work commenced, Gipson would submit invoices to U.A. Local 572 for the number of man-hours worked on the project in a given billing period, multiplied by the hourly rate previously authorized by U.A. Local 572. Gipson was awarded Market Recovery Fund grants by Borchert for the following projects:

| PROJECT | GRANT DATE |
|---|---|
| Nissan SR 1 Paint Facility | January 1, 2012 |
| Music City Center | January 31, 2014 |
| Fort Campbell Unmanned Aerial Vehicle – COF and TEMF Buildings | August 26, 2014 |
| Fire Station #33 | September 9, 2014 |
| MTSU - Student Services | December 19, 2014 |
| State of Tennessee Parking Garage | March 20, 2015 |
| HCA Capitol View | November 20, 2015 |
| MTSU Steam/Condensate | September 18, 2015 |
| MTSU Midgett Building | September 18, 2015 |

(*Id*. at 8.) As work proceeded on these projects and wages were paid accordingly, Gipson periodically submitted invoices and accompanying documentation to U.A. Local 572 for Market Recovery Fund payments. From 2012 to 2017, U.A. Local 572 made four Market Recovery Fund payments to Gipson, totaling approximately $250,000. During this same time period, U.A. Local 572 paid millions of dollars to other employers on grants issued months or years after the grants issued to Gipson.

Gipson alleges that, in addition to its failure to pay the Market Recovery Fund moneys it owed, U.A. Local 572 consistently failed to provide appropriately skilled and competent workers. As a result, defective mechanical work was installed by U.A. Local 572 journeymen and foremen on Gipson jobs. Gipson was required to remove and correct the defective work at substantial costs. Gipson incurred $133,736.25 to correct defective work on the Williamson County Performing Arts

& Enrichment Center, and $147,817.29 to correct defective work on the Austin Peay State University Trahern Building & Fine Arts Building. When Gipson notified U.A. Local 572 of correction costs, U.A. Local 572 Business Manager Robbie Carroll—who succeeded Billy Borchert—instructed Gipson to submit invoices for the costs incurred, indicating that U.A. Local 572 would reimburse Gipson for its losses. However, after receiving backup documentation and invoicing for those charges, U.A. Local 572 refused to pay Gipson. The Master Agreements state, in Section 4 of Article III:

> In hiring men, the Employer shall be the sole judge of the number of men required, and shall make the sole determination of the Employees [sic] competency for the work assigned. Contractors shall only employ qualified Journeymen Plumbers, Steamfitters, and Apprentices for Plumbing and Pipe Fitting work. Journeymen Plumbers and Pipe Fitters shall be qualified for employment who have had at least five (5) years actual practical working experience at the Plumbing and Pipe Fitting Trade as a Journeymen or who either:
>
> (A) Have successfully served an apprenticeship at the Trade under an Apprenticeship Program approved by the United States Bureau of Apprenticeship and Training, or State Division of Apprenticeship Standards.
>
> (B) Have had previous employment as a Journeyman Plumber and Pipe Fitter with a Contractor signatory to this Agreement, and whose services have proved satisfactory.

(*Id*. at 6.)

On November 1, 2017, Gipson Mechanical closed its Nashville Branch, in part due to the failure by U.A. Local 572 to timely make Mechanical Market Recovery Fund payments. As of that date, Gipson was owed the following Market Recovery Fund sums:

| PROJECT | AMOUNT |
|---|---|
| Nissan SR 1 Paint Facility | $6,336.00 |
| Music City Center | $110,897.34 |

| Fort Campbell Unmanned Aerial Vehicle – COF and TEMF Buildings | $126,224.00 |
|---|---|
| Fire Station #33 | $7,269.00 |
| MTSU - Student Services | $71,200.00 |
| State of Tennessee Parking Garage | $5,980.00 |
| HCA Capitol View | $46,000.00 |
| MTSU Steam/Condensate | $28,170.00 |
| MTSU Midgett Building | $2,190.00 |

(*Id*. at 11.) On January 19, 2018, Gipson transmitted through counsel a demand letter to Carroll. The letter requested the unpaid sums due from the Market Recovery Fund and Gipson's defective work claims. On April 10, 2018, U.A. Local 572 transmitted Market Recovery Fund payments for six projects. No payments were transmitted for the Nissan SR 1 Paint Facility, the Music City Center, or the Fort Campbell COF Building and TEMF Building projects. This left a total of $243,457.34 in unpaid Market Recovery Fund sums, in addition to the $281,553.53 allegedly owed for defective work costs.

On July 19, 2018, Gipson filed suit against Local 572 Building Corp. in the Circuit Court of Davidson County, Tennessee, alleging breach of contract. (Docket No. 1.) On August 16, 2018, Local 572 Building Corp. removed the case to this court pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a) (2012), which provides that "[s]uits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." On September 6, 2018, Gipson amended its Complaint, adding U.A. Local 572 as a defendant. (Docket No. 6.)

## **LEGAL STANDARD**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

## **ANALYSIS**

The defendants move to dismiss on several grounds. First, they allege that all claims against Local 572 Building Corp. should be dismissed because it is not a party to any contractual agreement with Gipson and therefore cannot be liable to Gipson for a breach of contract. In

conjunction with this argument, the defendants contend that Gipson has failed to plead sufficient facts to establish that U.A. Local 572 and Local 572 Building Corp. are alter egos. Next, they allege that Gipson has failed to exhaust the internal remedies set forth in the Master Agreements via Article XII's Grievance Procedure. Finally, they allege that, even if Gipson's claims are not subject to the Grievance Procedure, Gipson fails to state a claim upon which relief can be granted with regard to the allegedly defective work performed by union employees. The court will address each argument in turn.

**1. Are the defendants alter egos?**

Gipson has sufficiently pleaded facts showing that the defendants are alter egos of each other. Under Tennessee law, "[a]n alter ego or agency relationship is typified by the parent corporation's control of the subsidiary corporation's internal affairs or daily operations." *Wells ex rel. Baker v. State*, 435 S.W.3d 734, 756 (Tenn. Ct. App. 2013). Factors to be considered in determining whether an alter ego relationship exists include:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*F&M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc.*, 523 S.W.3d 663, 667 (Tenn. Ct. App. 2017), *appeal denied* (May 18, 2017). "Generally, no one factor is conclusive in determining whether to pierce the corporate veil; rather, courts will rely upon a combination of factors in deciding the issue." *Id.* "The existence of an alter-ego relationship is a question of fact." *Wells*,

435 S.W.3d at 756 (citing *Bracken v. Earl*, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000)); *see also Dog House Invs., LLC v. Teal Properties, Inc.,* 448 S.W.3d 905, 918 (Tenn. Ct. App. 2014) ("[T]he question of whether [a] corporate entity is 'a mere instrumentality of an individual or parent corporation' is a question of fact for the finder of fact.").

Gipson alleges that several of the factors listed above are present in the relationship between the defendants. The defendants share the same address and use the same physical space at 225 Ben Allen Road. U.A. Local 572 has listed that property, owned by Local 572 Building Corp., as collateral for loans. The defendants both employed for some time during the relevant time period the services of James Stranch, III, Esq. Gipson has pleaded facts that, if true, a reasonable jury could find sufficient to establish that the defendants are alter egos of one another. Claims against Local 572 Building Corp. will therefore not be dismissed at this stage.

**2. Does the Grievance Procedure govern?**

The defendants contend that Gipson's claims against it are not properly before this court because Gipson has not exhausted the internal remedies set forth in Article XII of the Master Agreements. Although § 301 of the LMRA permits district courts to hear contract disputes between a union and an employer under appropriate circumstances, § 203(d) provides that "[f]inal adjustment by method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement." There is a strong federal policy in favor of the finality of arbitration in resolving labor disputes by grievance procedures adopted by the parties. *Malone v. U.S. Postal Serv*., 526 F.2d 1099, 1104 (6th Cir. 1975). However, "it is not arbitration per se that federal policy favors, but rather final adjustment of differences by a means selected by the parties. If the parties agree that a procedure other than arbitration shall provide a conclusive resolution of

their differences, federal labor policy encourages that procedure no less than arbitration." *Bakers Union Factory v. ITT Cont'l Baking Co., Inc*., 749 F.2d 350, 353 (6th Cir. 1984) (quoting *United Mine Workers of Am., Dist. No. 2 v. Barnes & Tucker Co*., 561 F.2d 1093, 1096 (3d Cir. 1977)). Therefore, "if the parties provide that means other than arbitration will conclusively resolve their differences, a determination made pursuant to that chosen procedure is no less enforceable in a federal court than is an arbitration award." *Barnes & Tucker*, 561 F.2d at 1096. On the other hand, while courts have jurisdiction to enforce collective bargaining contracts, "where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute." *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc*., 484 U.S. 29, 37 (1987); *see also United Mine Workers of Am. Dist. No. 5 v. Consolidation Coal Co*., 666 F.2d 806, 811 (3d Cir. 1981) ("Federal courts are bound to exercise the utmost restraint to avoid intruding on the bargained-for method of dispute resolution . . . . If the court has any doubt, the parties should be returned to their grievance procedure.").

Gipson argues that Article XII does not govern for two reasons. First, it contends that the Grievance Procedure is not a dispute resolution process for claims brought by signatory employers, but instead a grievance resolution process for resolving grievances that union members bring against signatory employers. In support, Gipson cites various parts of Article XII which, it claims, provide a fuller context in which the Grievance Procedure is clearly intended only to apply to worker grievances. For example, Gipson notes that Section 2 states that "all terms and conditions for this Agreement shall continue in full force and effect, meanwhile, there shall be no work stoppage" for the duration of the grievance resolution process. (Docket No. 6-1 at 19.) While this provision does indeed seem calibrated toward worker grievances, it does not limit the broad

12

applicability of Article XII, which states that "[a]ll differences as to interpretation and meaning of the Agreement between the parties shall be settled in accordance with the following procedures." (*Id.*) Gipson, as a signatory employer, is a party to the Master Agreements. The Grievance Procedure therefore applies to claims brought by it against the union. *See Int'l Bhd. of Elec. Workers, Local Union No. 226 v. Wichita Elec. Co.,* No. 04-4028-JAR, 2005 WL 466206, at *6 (D. Kan. Feb. 4, 2005) (holding that grievance procedure in collective bargaining agreement governed breach of contract claim brought by employer against union) ("Because Wichita Electric has failed to follow the grievance procedure set forth in the CBA, its claim that the Union negligently selected workers in breach of the CBA must be dismissed as a matter of law.").

Gipson also makes a second argument: that its claims do not implicate "differences as to interpretation and meaning of the Agreement" (*id.*) and are therefore not governed by the Grievance Procedure. This argument fails as to Gipson's claim that the defendants breached their contractual obligations by providing unqualified workers. The Master Agreements state that, "[i]n hiring men, the Employer shall be the sole judge of the number of men required, and shall make the sole determination of the Employees [sic] competency for the work assigned." (Docket No. 6-1 at 6.) The Master Agreements further enumerate specific qualifications for Journeymen Plumbers and Pipe Fitters:

> Journeymen Plumbers and Pipe Fitters shall be qualified for employment who have had at least five (5) years actual practical working experience at the Plumbing and Pipe Fitting Trade as a Journeymen or who either:
>
> (C) Have successfully served an apprenticeship at the Trade under an Apprenticeship Program approved by the United States Bureau of Apprenticeship and Training, or State Division of Apprenticeship Standards.
>
> (D) Have had previous employment as a Journeyman Plumber and Pipe Fitter with a Contractor signatory to this Agreement, and whose services have proved satisfactory.

(*Id.*) Determination of whether the defendants owed a duty to provide qualified workers requires interpretation of these provisions. For example, does the clause reserving to employers the "sole determination of the Employees [sic] competency" absolve any liability on behalf of the union for defective work performed by union workers? And do the specific listed qualifications for some workers constitute an exhaustive list, precluding any competency-based claims against the union so long as the qualifications listed are met? These are matters of contract interpretation and are therefore reserved for resolution via the means set forth in the Grievance Procedure.

However, Gipson's claim to recover the Market Recovery Funds it is allegedly owed is another matter. The Memorandum of Understanding contains only a cursory summary of the agreement by which the defendants provided Market Recovery Fund Grants to Gipson:

> A "Target Rate" will be established based upon the average hourly cost of non-union labor. The union and the contractor mutually agree to use increased ratios, promotional funds and any other legal means available to provide skilled labor at an average rate equal to the target rate when competing against non-union contractors for commercial work.

Neither the Memorandum of Understanding nor the Master Agreements elucidate any terms or conditions by which Market Recovery Funds are to be paid. The documents do not provide any guidelines for how soon funds must be paid, whether they must be paid in any sequential order relative to when they were granted, or whether there are any situations in which funds may not be paid once they have been granted. Simply put, there is no contractual term in the agreements between the parties that is subject to interpretation in resolving Gipson's claim. The Memorandum of Understanding states that the parties agree to engage in cost-shifting measures to win competitive bids. Gipson pleads that it won such bids based on this agreement and that the defendants have not followed through on their end of the bargain. The defendants do not point to any provision of the Master Agreements or Memorandum of Understanding which could be

14

interpreted as relieving the defendants of certain Market Fund Recovery grant obligations. Gipson's claim is therefore not subject to Article XII's Grievance Procedure and will not be dismissed.

Finally, Gipson argues that the Grievance Procedure does not govern its claims against Local 572 Building Corp. because the building corporation is not a party to the Master Agreements. Thus, Gipson argues, only its defective work claim against the union would be subject to the Grievance Procedure. Because arbitration is "a matter of contract," Gipson is correct that a party generally "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., 475 U.S. at 648 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960)). However, the Sixth Circuit has held that arbitration agreements will be enforceable by or against nonsignatories to the same extent that any other contract would be enforceable by or against nonsignatories under state law. *See, e.g., Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) ("[N]onsignatories may be bound to an arbitration agreement under ordinary contract and agency principles." (citing *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990))). Indeed, federal courts have recognized at least five specific doctrines justifying the application of an arbitration clause to a nonsignatory: "'(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.'" *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir. 1999) (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)); *accord Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003); *Javitch*, 315 F.3d at 629; *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000); *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (recognizing that "traditional principles of state law allow a contract to be enforced by or against

nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel" and that such principles apply to arbitration agreements). As explained above, Gipson has sufficiently pled that the defendants are alter egos of each other. If that is the case, the Grievance Procedure is equally enforceable by Local 572 Building Corp., despite its not being a signatory to the Master Agreements. Gipson's claim for breach of contract stemming from defective employee work will therefore be dismissed for failure to exhaust the Master Agreements' Grievance Procedures.[5]

## CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Docket No. 12) will be granted in part. Gipson's claim for breach of contract stemming from defective employee work is subject to a contractual dispute resolution procedure will therefore be dismissed. Gipson's claim for breach of contract stemming from unpaid Market Recovery Fund sums will not be dismissed at this stage.

A separate order will issue.

ENTER this 24th day of January 2019.

_____
ALETA A. TRAUGER
United States District Judge

---

[5] Gipson makes an additional argument that the Grievance Procedure will deprive it of its due process rights because the procedure refers disputes to the Joint Arbitration Committee, which consists of three union representatives and three Historical Bargaining Group representatives. The Historical Bargaining Group consists of Gipson's competitors, and Gipson argues that it could not get a fair shake from these representatives because its claim is for Market Recovery Fund sums that it alleges was improperly paid to those competitors, despite Gipson's grants having been made first. The court need not address this argument because Gipson's claim for Market Recovery Fund sums is not subject to the Grievance Procedure. Gipson sets forth no due process argument with regard to its claim for defective work.