## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **GIPSON MECHANICAL CONTRACTORS, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No. 3:18-cv-00768** |
| | ) | **Judge Aleta A. Trauger** |
| **U.A. LOCAL 572 OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTERS INDUSTRY OF THE UNITED STATES AND CANADA (AFL-CIO), and PLUMBERS AND PIPEFITTERS LOCAL 572 BUILDING CORPORATION,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 76) filed by defendants

U.A. Local 572 of the United Association of the Journeymen and Apprentices of the Plumbing and

Pipefitters Industry of the United States and Canada (AFL-CIO) ("U.A. Local 572" or "the

Union") and Plumbing & Pipefitters Local 572 Building Corporation ("Building Corporation").[1]

For the reasons set forth herein, the motion will be granted in part and denied in part.

---

[1] The defendants previously brought a motion to dismiss that argued, in part, that the claims against the Building Corporation should be dismissed on the basis that it is not alleged to have engaged in any actions or inactions giving rise to the claims in this lawsuit. The court denied the motion, finding that the plaintiff "sufficiently pleaded facts showing that the defendants are alter egos of each other" under Tennessee law. (Doc. No. 19, at 10.) Even though the present motion is technically brought by both defendants, because the only defendant alleged to have participated in the events giving rise to the plaintiff's claims is U.A. Local 572, the court will refer to the Union as the "defendant," in the singular, throughout this Memorandum.

# I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

## A.    The Parties

Plaintiff Gipson Mechanical Contractors, Inc. ("Gipson Mechanical") is a Tennessee corporation in the business of providing construction services specializing in industrial mechanical work, pipefitting, mechanical service, and related work. It is a Minority Owned Business Enterprise. Winston Gipson is the President, CEO, and sole shareholder of Gipson Mechanical. (W. Gipson Decl., Doc. No. 79-2 ¶¶ 1–2.) Mr. Gipson is African American. (*Id.* ¶ 2.)

U.A. Local 572 is an unincorporated labor organization representing employees in the plumbing, pipefitting and mechanical trades in the Nashville, Tennessee area.

Gipson Mechanical became signatory to a series of collective bargaining agreements with U.A. Local 572, each entitled "Working Agreement Between Plumbers and Pipefitters U.A. Local 572 and the Master Plumbing Heating, Piping and Air conditioning Contractors of Nashville and Vicinity" ("Working Agreement"), beginning in 2008. The terms of each successive Working Agreement were essentially the same, with the exception of new wage rates and benefits. The plaintiff's claim for breach of the Working Agreements is no longer at issue in this case, having been dismissed in 2019. For purposes of the present motion, the Working Agreements are relevant only insofar as they establish that Gipson Mechanical, as a signatory, agreed to abide by a certain wage scale and working conditions when hiring employees "in the Bargaining Unit represented by" U.A. Local 572 and to contribute to unionized employees' Health and Welfare Fund and Pension Fund. (Doc. No. 76-2, at 6, 14.) And the Working Agreements establish that the Union's Business Manager is designated as the "Agent" of U.A. Local 572 and, as such, is "authorized to

---

[2] The facts for which no citation is provided are drawn from the plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Doc. No. 79-1) and are undisputed for purposes of the defendants' Motion for Summary Judgment.

act for, or on behalf of," the Union "under the terms of this Agreement." (*Id.* at 7.)

Billy Borchert was the Business Manager of U.A. Local 572 from at least 2007 through sometime in 2015, and he was succeeded at some point thereafter by Robbie Carroll. (Doc. No. 32 ¶¶ 16, 19, 22, 24; Answer, Doc. No. 39 ¶¶ 16, 19, 22.) Eric Coons became the Business Manager in August 2017. As Business Manager, he is responsible for running the day-to-day operations of the Union. Prior to his tenure, from January 11, 2016 until August 1, 2017, U.A. Local 572 had been "under trusteeship of the International Union." (Doc. No. 76–2, Coons Decl. ¶ 2.)

### B. The Market Recovery Program

At all times relevant to this litigation, U.A. Local 472 maintained a Market Recovery Program ("Program") that was funded through deductions from the wages of employees working for contractors signatory to the operative Working Agreement. The purpose of the Program is to enable signatory contractors to compete with mechanical contractors who utilize non-union employees and generally pay lower wages than unionized employers.

The defendant states that the Program was governed at all relevant times by the document entitled Plumbers and Pipefitters Market Recovery Program, Amended and Restated: November 1, 2006 ("Program Bylaws"). (*See* Doc. No. 76-2, at 27–37 (Ex. B to E. Coons Decl.).) The plaintiff denies that the Program Bylaws constitute the "operable document governing that Program." (Doc. No. 79-1, at 3 (Pl.'s Resp. to Statement No. 5).) The court finds this dispute to be immaterial. What is clear is that the plaintiff was never provided a copy of the Program Bylaws or apprised of their existence until sometime during the course of this litigation.

In any event, the Program Bylaws establish guidelines and procedures that are supposed to be followed by the Program's Executive Committee in considering and approving requests for Market Recovery grants. "Article I" of the Program Bylaws states that the Program will be "administered in accordance with these by-laws and shall be used for the purpose of creating a

flexible and equitable Market Recovery Program which is meant to fight substandard wages and working conditions for plumbers and pipefitters within the jurisdiction of Local 572." (Doc. No. 76-2, at 27.) Article I expressly recognizes that, while the Program was "created to further the Local 572's goal of preventing forces in the general economy . . . from undermining the wages and working conditions" of Union members and securing jobs for Union members, it operated "wholly within the purview of the" Union, and employers had "no role whatsoever in or responsibility concerning the Program." (*Id.*)

The Bylaws provide that the Program is to be administered by an Executive Committee, which "shall have the sole responsibility to determine which job(s) shall be eligible" for Program funds and, if a job is deemed eligible, "to determine the amount of money to be awarded for a job under the Program." (Doc. No. 76-2, at 29, 33.) The Program Bylaws identify certain characteristics a job must have in order for a grant to be available and certain requirements employers must meet to be eligible for Program funds, assuming such funds are available for a particular job. (*Id.* at 32–33.) As relevant here, the Bylaws state that, for funds to be available for a particular job, the job must be expected to have "non-union competition" and should be "private and not subject to the Davis-Bacon Act . . . or other prevailing wage job."[3] (*Id.* at 32.) The Bylaws also indicate that, for an employer to be eligible to receive funds, the employer must be a signatory to the Working Agreement with U.A. Local 572 and must be "current in the payment of [its] fringe

---

[3] "The Davis-Bacon Act, '[o]n its face,' is 'a minimum wage law designed for the benefit of construction workers.'" *U.S. ex rel. Int'l Bhd. of Elec. Workers Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 323 (3d Cir. 2021) (quoting *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 178 (1954). The Act "requires contractors on most federally funded infrastructure projects to pay employees minimum wages based on the [Department of Labor's] determination of prevailing wages 'for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed.'" *Id.* (quoting 40 U.S.C. § 3142(b)).

benefit contributions to the Plumbing and Pipefitting Industry Trust Funds" ("fringe benefit Funds") when it bids on and is awarded the job for which Program funds are available. (*Id.* at 33.)

The Bylaws provide procedures that employers should follow in requesting Program funds (*id.* at 33–34) and procedures the Executive Committee should follow in considering each application on a case-by-case basis (*id.* at 34) and awarding funds (*id.* at 36). In particular, each employer/contractor has the "duty to inquire whether a job it is bidding on is subject to a grant." (*Id.* at 36.) In addition, the Executive Committee "will notify those contractors known to be on a bid list for a job when that job is subject to a Market Recovery grant request." (*Id.* at 36.) Once a job has been deemed eligible and a certain amount of funds and employee hours determined to be available for a job, if a Union contractor is "awarded the contract on a Market Recovery job, the contractor should notify the Union in writing. Local 572 will in turn send a Letter of Commitment to the contractor confirming the amount of support to be awarded to the contractor and the maximum number of hours for which funds are committed." (*Id.* at 36.) In addition, "[a]s to each job which is awarded a grant, the Committee shall prepare a written report (using the form [entitled] Internal Operating Form B) for use in recording the grant and reporting to the Local Union membership." (*Id.* at 36.)

According to Gipson Mechanical, the process, in practice, did not work precisely in accordance with the procedure outlined by the Program Bylaws. In a Declaration submitted with the plaintiff's Response to the Motion for Summary Judgment, Winston Gipson attests that, from 2009 through 2015, U.A. Local 572's then Business Manager, Billy Borchert, "authorized Market Recovery Fund grants to Gipson Mechanical" and "advise[d] representatives of Gipson Mechanical regarding the maximum amount of the grant that would be committed for a particular project and the amount per man hour worked that would be paid upon submission of the required

timesheets." (Doc. No. 79-2 ¶ 6.) After obtaining an oral "commitment from Mr. Borchert regarding the amount of Market Recovery funds available for a particular project," Gipson Mechanical would "make adjustments in its bid estimates by reducing labor costs which would in turn allow Gipson Mechanical to better compete with non-union mechanical contractors." (*Id.* ¶ 7.)

In other words, this verbal "commitment" from Borchert was provided prior to the plaintiff's submitting a bid or being awarded a contract on a particular project. According to Mr. Gipson, if Gipson Mechanical was the successful bidder for a particular project, it would enter into a subcontract to perform the work at the "reduced labor costs that could be achieved as a result of the Market Recovery grants." (*Id.* ¶ 8.) After beginning work on the project, Gipson Mechanical would submit timesheets and invoices to U.A. Local 572 for the number of man hours worked on the project in a given billing period, in order to be paid the grant funds to which it was entitled. (*Id.*) Mr. Gipson states that, typically, "'[a]pproval letters' for particular Market Recovery grants would eventually be sent by Local 572, but those were always received after the subcontract for a particular project had been awarded to Gipson Mechanical" and after the verbal commitment from Borchert (*Id.* ¶¶ 7, 9.)

### C. The Alleged Breach of Contract

The plaintiff maintains that Billy Borchert awarded it Market Recovery funds for several jobs completed between 2012 and 2015 and that the funds were either not paid at all or were not paid in a timely fashion. Much of the Complaint consists of assertions that other construction companies received substantially more Market Recovery funds from the defendant than the plaintiff did during that timeframe. Even before the plaintiff initiated this lawsuit, however, it had been paid all the Market Recovery funds it contends it was promised, except for the funds related to four specific projects, identified by the parties as (1) the Nissan SR 1 Paint Facility job ("Nissan job"); (2) the Music City Center job; and (3) the Fort Campbell Unmanned Aerial Vehicle – COF

Building job and the Fort Campbell Unmanned Aerial Vehicle –TEMF Building job (collectively, the "Fort Campbell jobs"). (*Id.* ¶ 10.) The plaintiff's breach of contract claims are premised upon the defendant's failure to pay it the Market Recovery funds related to those jobs that were promised by Borchert. It maintains that it is still owed $6,336 on the Nissan job; $110,897.34 on the Music City Center job; and (3) $126,224 on the Fort Campbell jobs, for a total of $243,457.34 in damages for breach of contract, plus interest. (Doc. No. 79-2 ¶¶ 21, 54, 57; *see also* Doc. No. 76-6, at 27.)

Regarding the Nissan job, the plaintiff has submitted a copy of its request for Market Recovery funds and the Executive Committee's formal Letter of Commitment of funds for that project. (Doc. Nos. 80-1, at 1–2.) Gabrielle Gipson, Winston Gipson's daughter and the Office Manager of the Nashville Branch of Gipson Mechanical (G. Gipson Decl., Doc. No. 79-3 ¶¶ 1–2), testified that Gipson Mechanical was paid a portion of the funds committed for the Nissan job, but there was a "remaining balance" owed. (Doc. No. 76-7, at 35.) According to Winston Gipson, the remaining balance owed on this grant is $6,336. (Doc. No. 79-2 ¶ 21.) The defendant, in response, does not dispute that a Letter of Commitment was issued for this project. Instead, it argues that all grant monies owed on that project were paid, but it has not presented any actual evidence to support that assertion.[4]

Regarding the Music City Center job, the plaintiff has submitted an exchange of emails confirming its request for funds related to that project and indicating that Market Recovery funds were available for the project. The first of these emails is dated January 17, 2012 and is from David

---

[4] The defendant submitted a Reply to Plaintiff's Statement of Additional Disputed Facts, but most of the statements and denials set forth in this Reply are not supported by any reference to evidence in the record. For instance, in response to the plaintiff's statement that Gipson Mechanical was awarded grants on the three projects at issue here, the Union responds: "Admitted that a Market Recovery grant was awarded for the Nissan SR 1 Paint Facility, but all grant moneys owed were paid." (Doc. No. 85-3, Resp. to Statement No. 8.) The defendant did not provide a record citation to support that assertion, however.

Orman, Gipson Mechanical Branch Manager, to Jill Laczko, referencing a conversation that had taken place "a couple of weeks ago" and attaching a request for Market Recovery Funds in connection with the Music City Center job. (Doc. No. 80-2, at 1.) That attached request, dated August 8, 2010, referenced starting and completion dates on the project of August 2010 through March 2012 and requested funding for approximately 48,000 man hours of work. (Doc. No. 80-2, at 2.) There is no indication as to what transpired in the intervening period, but Laczko responded more than two years later with an email to Gabrielle Gipson, dated January 31, 2014, stating:

> I checked with Billy [Borchert] on this request and he said we need a dollar amount on the line 'g' instead of hours. Without that it leaves the job too open ended and probably won't go through. You don't have to redo the whole request just send me an email with the dollar amount that I can attach and that will suffice.

(Doc. No. 80-2, at 4.) Gabrielle Gipson responded that the "Line 'G' amount is $113,342.62." (*Id.*) Laczko responded with a terse, "Thanks Gabby." (*Id.*) The plaintiff never received a formal Letter of Commitment of funds for this job. However, Winston Gipson testified that Borchert advised him that funds were available for this job and that the rates for laborers and total number of hours were committed, as confirmed by the email exchange with Jill Laczko. The plaintiff submitted invoicing and certified payroll documentation in connection with the job. U.A. Local 572 never refuted the invoices, but it also never paid them. (Doc. No. 79-2 ¶ 12; *see also* W. Gipson Dep., Doc. No. 76-5, at 32–33.)[5]

Regarding the Fort Campbell jobs, Mr. Gipson, again, cannot point to a Letter of Commitment. Instead, he states that he had a "meeting with Mr. Borchert on August 26, 2014" and received a verbal "commitment" for $8.00 per man hour. (Doc. No. 79-2 ¶ 13.) Mr. Gipson

---

[5] The pagination of Winston Gipson's deposition transcript deviates from that of the CM/ECF electronic pagination by one page, because the cover page of the transcript was not assigned a page number. The court uses the CM/ECF pagination.

followed up with an email to Robbie Carroll later that day, noting that "the commitment on these two project[s] is $8.00 per hour" and identifying the total projected man hours on both projects and total Market Funds committed. (Doc. No. 80-3, at 3.) He concluded: "As agreed, Gipson Mechanical will send the invoices and payroll reports in for processing and payment." (*Id.*) Gipson asserts that Borchert was "aware of the nature of th[ese] Project[s] and for what entity the work was being performed" and "aware that the Local 572 wage rates were actually higher than the wage rates required by the Davis-Bacon Act." (*Id.*)

It is undisputed that the Fort Campbell projects were subject to the Davis-Bacon Act's prevailing wages requirement. Gipson Mechanical also acknowledges that it was delinquent in its contributions to the Union's fringe benefit Funds between 2010 and 2015. The Funds filed suit in this court in 2012 against Gipson Mechanical to collect the contributions, interest, and penalties owed. A settlement agreement was reached in March 2015, requiring Gipson Mechanical to make monthly payments on an arrearage of $238,837.02. While admitting these facts, the plaintiff states that the reason it was in arrears is because U.A. Local 572 had failed to pay Market Recovery Grant funds owed to Gipson Mechanical. (Doc. No. 79-2 ¶ 14.)

### D. The Payment of Market Recovery Funds by Eric Coons

At the time that the Union was placed under Administration by the International Union in January 2016, the Union was in substantial debt, with liabilities exceeding assets by over Two Million Dollars. No Market Recovery money was paid out by the International Administrator during the 2016–2017 period of the trusteeship, with the exception of two payments: one to Gipson Mechanical in the amount of $2,118.36, and one to Bassett Mechanical for $37,240.20, which, according to the defendant, represented 50% of the amount the company claimed it was owed.

According to an "Aged Payables" printout that Eric Coons, as Business Manager, inherited from the International Administrator, labeled "P & P LU 572 Market Recovery Fd.-A," as of

August 31, 2017, a total of $1,497,337.68 in Market Recovery funds was owed to a total of 17 signatory employers—some minority owned, some not.

After reviewing available records, Coons paid out Market Recovery monies to a number of contractors in April 2018, including Gipson Mechanical, AMI (a minority owned company), and Nashville Machine (a non-minority owned company). The payments to Gipson Mechanical totaled $161,908. As of August 17, 2017, Nashville Machine had submitted invoices for Market Recovery funds for more than $300,000 that had not been paid. Nashville Machine received two checks from U.A. Local 572 dated April 10, 2018, in the amounts of $122,290 and $135,860.

After the receipt of $161,908, Gipson Mechanical has continued to maintain, as noted above, that it is still owed grant money on the jobs referenced above: (1) $6,336 for the Nissan job; (2) $110,897.34 for the Music City Center job; and (3) $126,224 on the Fort Campbell jobs for a total of $243,457.34. (Doc. No. 79-2 ¶ 21.)

### E. Race Discrimination Allegations

Regarding the plaintiff's allegations of race discrimination in support of the claim under 42 U.S.C. § 1981, in 2016, Gabrielle Gipson, Winston Gipson, and Don Pyron, a Gipson Mechanical employee, had lunch with Billy Borchert. During this meeting, Borchert stated that U.A. Local 572 had been working to put Gipson Mechanical out of business and he wanted them to be aware of this. No one asked Borchert any questions about this statement, including why the Union wanted to put Gipson Mechanical out of business or whether it had anything to do with Winston Gipson's (or Gabrielle Gipson's) being African American. (*See* Doc. No. 76-5, at 71; *see also* G. Gipson Dep., Doc. No. 76-7, at 31–32.)[6]

---

[6] The pagination of Gabrielle Gipson's deposition transcript also deviates from that of the CM/ECF electronic pagination by one page, because the cover page of the transcript was not assigned a page number. The court uses the CM/ECF pagination.

In late 2016, Gabrielle Gibson had a meeting with Robbie Carroll, who at that time was the Business Manager for U.A. Local 572, to discuss poor workmanship issues that Gipson Mechanical was having with work performed by Union members being dispatched to Gipson Mechanical to work on construction projects. In this meeting, Carroll told Ms. Gipson that Gipson Mechanical was "getting five percent, we're giving you the bottom of the barrel." (Doc. No. 76-7, at 37.) Ms. Gipson interpreted this to mean that the Union was discriminating against Gipson Mechanical by sending it subpar workers. After this meeting, the workmanship by Union members did not improve. Gabrielle Gipson, along with Gipson Mechanical's superintendent at the time, David Wilson, went to the offices of U.A. Local 572 to speak with Danny Etheridge about this ongoing problem. The meeting became "hot and heated," to the point that Etheridge told her, "well, if you don't like it, you can take your ass back to Memphis." (*Id.* at 38.) Ms. Gipson interpreted this as a racist comment.

On March 29, 2017, another meeting took place at Gipson Mechanical's office between several representatives of Gipson Mechanical and Robbie Carroll and the "UA organizer" to discuss the Market Recovery funds due Gipson Mechanical. In his Declaration, Winston Gipson testified that the "UA organizer" and Carroll never denied that the Union owed the funds to Gipson Mechanical, but they stated instead that "they simply were not going to pay Gipson Mechanical." (Doc. No. 79-2 ¶ 18.) In his deposition, Mr. Gipson acknowledged that the "organizer" was the administrator from the International union, sent down to administer U.A. Local 572 while it was under trusteeship. (Doc. No. 76-5, at 43.) At this meeting, the administrator told him, "I ain't paying you and I ain't paying nobody else." (*Id.* at 44.) It is undisputed that, while the Union was under trusteeship, it did not pay out Market Recovery funds to any contractors, except for the two payments referenced above, one of which was to Gipson Mechanical.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    DISCUSSION

### A.    Breach of Contract Claim

"The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citation omitted). "In Tennessee and generally, two essential elements in the formation of a valid contract are (1) consideration and (2) mutual assent." *Sevier Cty. Sch. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470, 476 (6th Cir. 2021) (citing *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005)).

The defendant argues that Gipson Mechanical's breach of contract claims fail because "there is simply no contract that requires the payment of market recovery grants at all," much less a contract that provides when or in what order the grants that are awarded must be paid or that provides for interest or other damages. (Doc. No. 76-1, at 6.)

The defendant's arguments regarding the existence of a contract are focused on the Program Bylaws. Specifically, the defendant contends that the Program Bylaws govern the dispersal of Market Recovery funds. That document articulates a procedure for awarding grants that includes language indicating that, once a contractor is awarded the contract for a Market Recovery job, the Committee will send a "Letter of Commitment to the contractor confirming the amount of support to be awarded to the contractor and the maximum number of hours for which funds are committed." (Doc. No. 76-2, at 36.) The form approval letter, copies of which the plaintiff had received for other jobs, specifically states: "Payments to you from Local 572's market Recovery Fund will be made on this approved grant over time as funds allow." (*See, e.g.*, Doc. No. 76-6, at 29.) The Program Bylaws state that, to be eligible for an award, the recipient must not be delinquent in its contributions to U.A. Local 572 fringe benefit Funds and further states that only "private" jobs that are "not subject to the Davis-Bacon Act, a 'little' Davis-Bacon Act or other

prevailing wage" are jobs eligible for a grant under the Program. (Doc. No. 76-2, at 32, 33.) The defendant argues that the plaintiff's breach of contract claims fail because: (1) it never received confirmation letters from the Executive Committee confirming the grants that are the subject of this lawsuit; (2) the plaintiff was admittedly delinquent in its payment of contributions to the fringe benefit Funds and therefore not eligible for the grants; (3) the plaintiff received the money to which it was entitled for the Nissan job; and (4) the Fort Campbell jobs were subject to the Davis-Bacon Act and therefore not eligible for grant funds.

The defendant's arguments are unavailing and largely beside the point—the primary point being that the Program Bylaws served to provide guidelines for the awarding and recording of Market Recovery grants, but it was not a contract, and it did not actually govern the terms of any contract formed between Gipson Mechanical and U.A. Local 572. Moreover, it is apparently undisputed that Gipson Mechanical never received a copy of the Program Bylaws, and Winston Gipson was not aware of their existence until they were produced in discovery.

The testimony of Winston Gipson establishes that, in practice, his company would submit a written request for a Market Recovery grant on a specific job, receive oral confirmation from Billy Borchert that grant funds were available for that job and that the grant would be approved up to a certain number of man hours and funds per hour. After receiving that oral commitment that a particular job was eligible for Market Recovery funds, Gipson Mechanical would tailor its bid for the job in question accordingly, in order to compete with non-union bidders. Once Gipson Mechanical's bid was actually accepted for a particular job, the company would eventually receive written confirmation of the funding to which Billy Borchert had already committed orally. (*See* Doc. No. 79-2 ¶¶ 6–9.)

The defendant does not explicitly contend that this practice failed to result in valid and

binding contracts between the plaintiff and the Union. In the absence of argument to the contrary, the court finds that the parties' dealings did give rise to enforceable contractual obligations. The plaintiff's written requests setting forth specific terms, including the man hours, support per hour, and maximum total funds requested, constituted offers. Borchert's verbal or emailed acceptance of those terms created contracts. The fact that Borchert never communicated other terms to the plaintiff means that such other terms were not incorporated into the agreements. The agreements were supported by consideration in the form of the plaintiff's commitment to employ unionized workers and its tailoring of its bids on whatever job was at issue in conformance with the Market Recovery funds commitment received from Borchert, in exchange for the committed funding.

Moreover, as Winston Gipson points out, although he understood that the Executive Committee would typically issue an after-the-fact written confirmation of the terms of the funds granted, the terms of the Working Agreement between him and the Union establish that Borchert, as the Union's Business Manager, had full authority to bind the Union. (Doc. No. 76-2, at 7.) Moreover, Mr. Gipson had no reason to suspect that Borchert would verbally commit to the payment of funds if the Executive Committee had not already agreed as well.

Regarding the Nissan job, the defendant's Memorandum contains no specific argument. The evidence in the record establishes both that the plaintiff made a formal request for funds and that the defendant provided written confirmation that Gipson Mechanical "has qualified for a grant in the maximum amount of $47,360.00 in connection with plumbing or pipefitting work to be performed" at the Nissan job. (Doc. Nos. 80-1, at 1–2.) Thus, for purposes of the Motion for Summary Judgment, there is at least a material factual dispute as to whether a contract was formed for the payment of that sum, assuming certain conditions were met. In addition, there is a question of fact as to whether U.A. Local 572 breached that agreement. Gabrielle Gipson testified that

Gipson Mechanical was paid a portion of the funds awarded, but there was a "remaining balance" owed. (Doc. No. 76-7, at 35.) According to Winston Gipson, the remaining balance owed on this grant is $6,336. (Doc. No. 79-2 ¶ 21.) In its Reply to the plaintiff's Statement of Additional Facts, the defendant admits "that a Market Recovery grant was awarded for the Nissan SR 1 Paint Facility," but it asserts that "all grant moneys owed were paid." (Doc. No. 85-3, Resp. to Statement No. 8.) Even if it had provided documentation or any other evidence to support that assertion (it did not), there is a material factual dispute as to whether the defendant breached its agreement to pay the full amount of Market Recovery funds it committed to pay Gipson Mechanical on this job.

Regarding the Music City Center job, the plaintiff has submitted substantial documentation showing that it formally requested a grant in connection with that job and amended its proposal in accordance with Billy Borchert's request. Mr. Gipson also flew to Kansas City to talk to representatives of the Foley Company, essentially at Borchert's request and with a piece of paper in hand from Borchert showing an increasing scale of reimbursement over the course of the years on which the work on the project would be performed. (*See* Doc. No. 76-6, at 16; Doc. No. 76-5, at 31–32.) Although Gipson Mechanical never received a formal grant approval letter for the project, Borchert told Winston Gipson that the request had been approved. (Doc. No. 76-5, at 23, 35–36.) Gipson Mechanical submitted invoices with "certified payrolls"; U.A. Local 572 neither refuted the invoices nor paid them. (Doc. No. 79-2 ¶ 12.) Winston Gipson testified that there was "no way" he could have known that Borchert would not "come through" with a formal approval letter, and, if he had known, his company would not have committed the number of man hours it did to the project. (Doc. No. 76-5, at 36.)

Based on this testimony, which is unrefuted, the court finds that there is at least a material factual dispute as to whether a valid and enforceable contract was formed and, consequently, as to

whether the defendant breached it. The fact that a formal grant letter was never issued, while relevant, is not dispositive of the question of whether a contract was formed. The fact that Gipson Mechanical was delinquent on payments to the fringe benefit Funds is irrelevant, because the company was never informed that it was ineligible for grants on that or any other basis.

Likewise, with respect to the Fort Campbell projects, the plaintiff has submitted evidence that it requested Market Recovery funds for two related projects. It has also submitted evidence in support of its contention that Borchert verbally approved the requests, that other companies received Market Recovery funds in connection with Fort Campbell projects, that the plaintiff was never informed that Market Recovery funds were not available for work performed on the Fort Campbell base, or that Gipson Mechanical was ineligible for grant payments because of the status of its payment to the Union's fringe benefit Funds. Here, again, there are material factual disputes as to whether enforceable contracts were formed and as to whether the defendant breached its obligations.

Regarding interest, the defendant argues only that the Program Bylaws do not provide for interest payments, and the confirmation letters expressly provide that payments will be made "over time as funds allow." (Doc. No. 76-1, at 8.) As already discussed, however, the Program Bylaws were not incorporated into the agreements with the plaintiff for the payment of Market Recovery funds, and Tennessee law irrefutably permits the recovery of prejudgment interest in breach of contract cases. *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 928 (Tenn. 1998) (holding that, when a party is entitled to compensatory damages, a plaintiff can also be entitled to prejudgment interest "as part of the compensatory damages"); *101 Constr. Co. v. Hammet*, 603 S.W.3d 786, 799 (Tenn. Ct. App. 2019), *appeal denied* (Mar. 26, 2020) ("In Tennessee, prejudgment interest is considered . . . 'as an element of, or in the nature of, damages[.]' A trial court can award

prejudgment interest in its discretion 'in accordance with the principles of equity[.]'" (quoting Tenn. Code Ann. § 47-14-123)). While there may well be equitable reasons not to award prejudgment interest in this case, the Program Bylaws, standing alone, do not foreclose the plaintiff's claim for interest as part of its damages.

The defendant is not entitled to summary judgment on the plaintiff's breach of contract claims.

## B. Section 1981 Claim

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "The statute prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). To prevail on a claim under § 1981, a plaintiff must plead and prove that "(1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). More specifically, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). The standard of causation for a § 1981 claim is the "traditional" "but for" causation—meaning that a plaintiff must prove that its injury would not have occurred "but for" the defendant's unlawful conduct—rather than the "motivating factor" standard that applies in Title VII employment discrimination cases. *Id.* at 1013, 1017.

A plaintiff seeking to prove intentional discrimination in violation of § 1981 may rely on either direct or indirect evidence. *Amini*, 440 F.3d at 358. Direct evidence is evidence that, "if

believed, requires the conclusion that [race] was the 'but for' cause of the [adverse] decision." S*cheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 530 (6th Cir. 2014). "In other words: 'Direct evidence is evidence that proves the existence of a fact without requiring any inferences.'" *Id.* (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)).

When a § 1981 plaintiff does not allege direct evidence of discrimination, the Sixth Circuit has typically applied the *McDonnell Douglas* burden-shifting analysis at the summary judgment stage. *See, e.g.*, *Amini*, 440 F.3d at 358. Under this framework, if a plaintiff sustains its initial burden of establishing a *prima facie* case of discrimination, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged conduct. If it meets that burden of production, then the burden shifts back to the plaintiff to advance evidence that the defendant's justification is a pretext for intentional discrimination. *B & S Transp., Inc. v. Bridgestone Ams. Tire Operations, LLC*, 758 F. App'x 503, 505 (6th Cir. 2019).

While the Supreme Court in *Comcast Corp.* expressed some doubt as to the applicability of *McDonnell Douglas* to § 1981 cases, it also acknowledged that *McDonnell Douglas* "arose in a context where but-for causation was the undisputed test" and, therefore, "did not address causation standards." *Comcast Corp.*, 140 S. Ct. at 1019. The Sixth Circuit has not yet had the occasion to consider the question, but other courts have continued to apply *McDonnell Douglas* to § 1981 claims in opinions issued after *Comcast Corp.*, typically noting that *Comcast Corp.* characterized *McDonnell Douglas* as simply "a tool for assessing claims, typically at summary judgment, when the plaintiff relies on indirect proof of discrimination." *See, e.g.*, *Gary v. Facebook, Inc.*, 822 F. App'x 175, 180 (4th Cir. 2020) (quoting *Comcast Corp.*, 140 S. Ct. at 2019); *Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 594 (10th Cir. 2020) (same).

Insofar as the defendant is arguing that the plaintiff lacks direct evidence of discrimination,

it is correct. The plaintiff has not pointed to any direct evidence of discrimination on the basis of race and, in responding to the Motion for Summary Judgment, does not argue to the contrary.

Regarding indirect evidence, the defendant appears to have misread *Comcast Corp.* as obviating the use of *McDonnell Douglas* and requiring a § 1981 plaintiff to prove its claim using only direct evidence rather than indirect evidence. Based on that interpretation, the defendant argues that Gipson Mechanical's § 1981 claim is subject to dismissal because Winston Gipson has been unable to "identify any evidence of intentional or purposeful discrimination." (Doc. No. 76-1, at 10.) This argument is misplaced, as the fact that the plaintiff lacks direct evidence of discrimination does not necessarily doom its claim.

However, while the defendant only cursorily addresses the question of whether the plaintiff can prove a *prima facie* case of discrimination using indirect evidence, it does posit that, "even if § 1981 claims are reviewed under the same standards as claims of race discrimination under Title VII,[7] Plaintiff cannot meet its burden of proof." (Doc. No. 76-1, at 14; *see also* Doc. No. 85, at 7 ("Plaintiff has woefully failed to meet the standards for even a *prima facie* case of disparate treatment as required by *McDonnell Douglas*.").) More specifically, the defendant argues that (1) the plaintiff was "delinquent in its payment of contributions to the fringe benefit Funds and there is no evidence that other contractors were paid while delinquent"; and (2) the plaintiff cannot show that it was treated differently than other non-minority contractors. (Doc. No. 76-1, at 14.)

The elements of a *prima facie* case are "not inflexible, as '[t]he facts necessarily will vary," and the "*prima facie* proof required from [the plaintiff] is not necessarily applicable in every respect in differing factual situations." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253

---

[7] As noted above, the causation standards are not the same, as the Supreme Court reiterated in *Comcast Corp.*, because the "motivating factor" causation standard applies to Title VII claims.

n.6 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973)). In the context presented here, the court finds that the plaintiff, to survive summary judgment, must show that (1) it is a member of a protected class; (2) it was qualified for Market Recovery grants; (3) it suffered an adverse decision related to the award of funds; and (4) it was treated differently than similarly situated non-protected contractors. *Accord TLC Realty 1 LLC v. Belfor USA Grp., Inc.*, 166 F. Supp. 3d 919, 925 (S.D. Ohio 2016) (citation omitted).

Here, the court understands the defendant to be arguing that the plaintiff cannot establish a *prima facie* case of discrimination, because, first, it was not qualified to receive Market Recovery funds, because it was delinquent in its payment of contributions to the Union's fringe benefit Funds during the relevant timeframe, as required for eligibility by the Program Bylaws. The court finds, however, that there is a material factual dispute as to whether the plaintiff was required to meet that criterion in order to receive funds, as it is clear that Gipson Mechanical had previously received Market Recovery funds while it was delinquent in its payments to the fringe benefit Funds. Moreover, as noted above, Mr. Gipson never received a copy of the Program Bylaws until after initiating this lawsuit and was never informed by Borchert or anyone else that his company was ineligible to participate in the Program as a result of its failure to remain current in its fringe benefit contributions.

Second, the defendant argues that the plaintiff cannot show that it was "similarly situated to any other non-minority owned company and was treated discriminatorily." (Doc. No. 85, at 6.) This argument finds better traction. While the plaintiff insists that it has shown that it was the "victim of disparate treatment" (Doc. No. 79, at 3), the only "evidence" in the record to which it points in support of that assertion is the Declaration of Scott Frick, plaintiff's counsel, attesting that, among the documents produced in discovery are "certain spreadsheets for the years 2013

through 2015 showing Market Recovery Grants and payments to signatory [contractors]" that "show numerous awards made to other signatory contractors on projects construct[ed] for Ft. Campbell, and that numerous other contractors were paid on awards granted subsequent to awards made to Gipson Mechanical." (Doc. No. 79-4 ¶ 3.)

Regarding payments for work at Fort Campbell, the spreadsheet attached as Exhibit A to the Frick Declaration, cited in support of this assertion, indeed appears to show Market Recovery fund payments made to contractors for work performed at Fort Campbell between 2010 and 2013, but no payments made after 2013. (Doc. No. 81-1.) The plaintiff has not shown that these contractors were similarly situated to it in all relevant respects, nor has it shown that all of the contractors were non-minority owned contractors. In addition, the plaintiff's requests for funding on the Fort Campbell jobs were submitted in 2014. (*See* Doc. No. 81-3.) There is no dispute that the Union was in financial disarray for a substantial period of time, which resulted in the International union's sending a representative to administer U.A. Local 572 while it was in a trusteeship from January 11, 2016 until August 1, 2017, during which time almost no Market Recovery fund payments were made. When Eric Coons became Business Manager, he attempted to interpret U.A. Local 572's records and to make payments, not just to the plaintiff but to numerous other contractors who had not received committed funds for a substantial period of time. The plaintiff has not shown that Eric Coons made any payments for work at Fort Campbell done in or after 2014 to any other contractors, much less that non-minority owned contractors were paid while the plaintiff was not.

Likewise, to the extent the plaintiff continues to argue that "other contractors were paid on awards granted subsequent to awards made Gipson Mechanical" (Doc. No. 79-3 ¶ 3), the plaintiff has no evidence that it is similarly situated to the contractors who were paid. It offers no evidence

regarding when the claims for reimbursement were submitted, in what amount, or with what support. Moreover, the evidence establishes that numerous other contractors were not paid on a timely basis and, when they were paid, were not paid the full amounts of their claims. And, again, the plaintiff has not shown that the contractors who were supposedly paid ahead of it were non-minority owned contractors.

Insofar as the plaintiff may be arguing that the failure to pay it for the jobs that are the subject to the breach of contract claims also constitutes evidence of disparate impact, the same analysis applies. The plaintiff has not shown that Eric Coons paid Market Recovery funds to non-minority owned contractors who, like the plaintiff, are unable to show that they received commitment letters from the Program Executive Committee, nor does the plaintiff have any evidence regarding whether other contractors, minority owned or otherwise, either (1) received Market Fund awards despite never having received commitment letters; or (2) received verbal commitments from Borchert but later never received the promised commitment letters.

In sum, while there are material factual disputes that preclude summary judgment on the plaintiff's breach of contract claims, as set forth above, the plaintiff lacks evidence to show that it was treated differently from similarly situated non-minority owned contractors, for purposes of a *prima facie* case of race discrimination in violation of § 1981.

The defendant is entitled to summary judgment on this claim.

## IV. CONCLUSION

For the reasons set forth herein, the defendants' Motion for Summary Judgment will be granted in part and denied in part. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge